IN THE SUPREME COURT OF NORTH CAROLINA

No. 139A18

Filed 28 February 2019

SCIGRIP, INC. f/k/a IPS STRUCTURAL ADHESIVES HOLDINGS, INC. and IPS INTERMEDIATE HOLDINGS CORPORATION

v.

SAMUEL B. OSAE and SCOTT BADER, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a)(3) from an interlocutory order entered on 16 January 2018 by Special Superior Court Judge for Complex Business Cases Michael L. Robinson in Superior Court, Durham County, after the case was designated a mandatory complex business case by the Chief Justice under N.C.G.S. § 45.4(b). Heard in the Supreme Court on 28 August 2019.

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene, Benjamin Thompson, and J. Blakely Kiefer, for plaintiff-appellants.*

*Mast, Mast, Johnson, Wells & Trimyer, by George B. Mast, Charles D. Mast, Clint Mast, and Lily Van Patten, for defendant-appellee Samuel B. Osae.*

*Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Philip J. Strach and Brodie D. Erwin, for defendant-appellee Scott Bader, Inc.*

ERVIN, Justice.

This case involves a dispute between plaintiff SciGrip, Inc. (formerly known as IPS Structural Adhesives Holdings, Inc.), a wholly-owned subsidiary of plaintiff IPS Intermediate Holdings Corporation (collectively, SciGrip); defendant Samuel Osae, a

chemist formerly employed by SciGrip; and defendant Scott Bader, Inc., by which Mr. Osae became employed after his departure from SciGrip's employment. SciGrip and Scott Bader were competitors in the development, manufacture, and sale of structural methyl methacrylate adhesives used in the marine and other industries for the purpose of bonding metals, composites, and plastics. As will be discussed in greater detail below, the issues before us in this case involve whether the trial court correctly decided the parties' summary judgment motions relating to the claims asserted in SciGrip's amended complaint for misappropriation of trade secrets, unfair and deceptive trade practices, breach of contract, and punitive damages and Mr. Osae's motions to exclude the testimony of two expert witnesses proffered by SciGrip. After careful consideration of the parties' challenges to the trial court's order in light of the record evidence, we conclude that the challenged trial court order should be affirmed.

## I. Factual Background

### A. Substantive Facts

In July 2000, SciGrip, a corporation involved in the formulation, manufacture, and sale of structural adhesives, hired Mr. Osae as an Application and Development Manager responsible for formulating structural methyl methacrylate adhesives. Mr. Osae served as the sole formula chemist in SciGrip's Durham office and as the person within the company with principal responsibility for formulating structural methyl methacrylate adhesives.

At the time that he entered into its employment, Mr. Osae signed a Proprietary Information and Inventions Agreement in which he agreed to refrain from disclosing any of SciGrip's proprietary information to any person or entity at any time during or after his employment with SciGrip.[1]  In addition, Mr. Osae assigned all of the intellectual property rights and trade secrets that he learned or developed during his employment to SciGrip.  On 21 December 2006 and 4 January 2008, respectively, Mr. Osae signed two Nonqualified Stock Option Agreements in which he agreed to maintain the confidentiality of all non-public information in his possession relating to SciGrip and to refrain from working for a competitor after leaving SciGrip's employment for periods of two years and one year, respectively.

Subsequently, Mr. Osae entered into discussions with Scott Bader about the possibility that Mr. Osae would work for Scott Bader in connection with its efforts to develop a structural methyl methacrylate adhesive product to be known as Crestabond.  At the time that he met with Scott Bader representatives, Mr. Osae stated that he was dissatisfied with the recognition that he had received at SciGrip,

---

[1] According to the Proprietary Information and Inventions Agreement, "proprietary information" is defined as "any information, technical or nontechnical, that derives independent economic value, actual or potential, from not being known to the public or other persons outside [SciGrip] who can obtain economic value from its disclosure or use, and includes information of [SciGrip], its customers, suppliers, licensors, licensees, distributors and other persons and entities with whom [SciGrip] does business," including, but not limited to, any "formulas, developmental or experimental work, methods, techniques, processes, customer lists, business plans, marketing plans, pricing information, and financial information."

that he wanted to leave SciGrip's employment, and that he could assist Scott Bader in developing structural methyl methacrylate adhesives.

On 27 August 2008, Mr. Osae resigned from his employment at SciGrip to take a position with Scott Bader as a senior applications chemist. At the time that he left SciGrip's employment, Mr. Osae executed a termination certificate in which he agreed to maintain the confidentiality of SciGrip's proprietary information. While employed with Scott Bader, Mr. Osae remained a North Carolina resident, travelling to the United Kingdom and, after 2009, to Ohio for the purpose of performing any necessary laboratory work. In October 2008, John Reeves, who served as SciGrip's president, encountered Mr. Osae at a trade show, where Mr. Osae told Mr. Reeves that he had joined Scott Bader and was involved in the development of structural methyl methacrylate adhesives.

On 12 November 2008, SciGrip filed a complaint in Superior Court, Durham County, against Mr. Osae and Scott Bader in which it alleged that defendants had misappropriated SciGrip's trade secrets; engaged in unfair and deceptive trade practices; and sought to enforce the provisions of the Proprietary Information and Inventions Agreement and the Nonqualified Stock Options Agreements that Mr. Osae had executed during his employment with SciGrip. *See IPS Structural Adhesives Holdings, Inc. v. Osae*, 2018 NCBC 10, 2018 WL 632950. On 15 December 2008, the parties agreed to the entry of a consent order for the purpose of resolving the issues that were in dispute between them. According to the consent order, which

utilized the definition of confidential information contained in the Proprietary Information and Inventions Agreement, Mr. Osae was prohibited from disclosing, and Scott Bader was prohibited from using, any of SciGrip's protected information. On the other hand, the consent order allowed Mr. Osae to continue working for Scott Bader on the condition that he perform all of his laboratory work in the United Kingdom until 1 January 2010. Finally, the consent order prohibited Scott Bader from introducing new products that competed with those offered by SciGrip until September 2009.

After the entry of the consent order, Mr. Osae developed several Crestabond formulations for Scott Bader. In April 2009, Scott Bader began preparing a patent application relating to these newly developed formulations. In February 2010, Scott Bader filed an application for the issuance of a European patent relating to its Crestabond formulations that was published on 1 September 2011. Scott Bader's patent application disclosed the components used in the newly formulated Crestabond products.

After it became concerned about the work that Mr. Osae had been performing for Scott Bader, SciGrip hired Chemir Analytical Services to perform a deformulation analysis of a sample of a new Scott Bader product in order to identify the components utilized in that product and to determine how much of each component was present in it. On 28 April 2011, Chemir provided a report to SciGrip that identified some of the chemicals and materials that had been used in the new Scott Bader product

without providing a complete identification of all of the materials that the product contained. Although the Chemir report did not indicate that any of SciGrip's propriety materials had been included in the new Scott Bader product, the report did express concerns about "what [Mr. Osae] was doing."

In June 2011, while he was still employed by Scott Bader, Mr. Osae formed a new structural methyl methacrylate adhesive company named Engineered Bonding Solutions, LLC. On 26 August 2011, Mr. Osae resigned from his employment with Scott Bader and moved to Florida, where he became Vice President of Technology at Engineered Bonding. However, Mr. Osae continued to be a North Carolina resident through at least 15 December 2014. After becoming associated with Engineered Bonding, Mr. Osae served as the sole formulator and developer of the company's structural methyl methacrylate adhesives product, which was known as Acralock. On 24 September 2012, Engineered Bonding filed a provisional patent application with the United States Patent and Trademark Office relating to an Acralock product, with this application having been published on 21 June 2016.

At approximately the same time that Scott Bader's European patent was published in September 2012, SciGrip began discussions with an entity that was interested in acquiring SciGrip. During the course of these discussions, a representative from the potential acquiring company expressed concern about whether Mr. Osae had disclosed SciGrip's product formulations and indicated that the publication of Scott Bader's European patent application would have a material,

negative effect upon SciGrip's value. SciGrip had not been aware of Scott Bader's European patent application until the date of this conversation. Ultimately, the potential acquiring entity decided to refrain from acquiring SciGrip.

## B. Procedural History

On 3 May 2013, SciGrip filed a complaint in the Superior Court, Durham County, in which it asserted claims against Mr. Osae for breach of contract, misappropriation of trade secrets, and unfair and deceptive trade practices. On 1 December 2014, SciGrip filed an amended complaint that asserted claims against both Mr. Osae and Scott Bader. Ultimately, SciGrip asserted claims for (1) misappropriation of trade secrets against both defendants; (2) breach of contract against both defendants for violating the consent order during Mr. Osae's employment with Scott Bader; (3) breach of contract against Mr. Osae for violating the consent order during his employment with Engineered Bonding; (4) unfair and deceptive trade practices against both defendants; and (5) claims for punitive damages against both defendants. Mr. Osae and Scott Bader filed answers to SciGrip's amended complaint on 5 January 2015 and 12 March 2015, respectively, in which they denied the material allegations of the amended complaint and asserted various affirmative defenses.

On 31 May 2017, SciGrip filed a motion seeking summary judgment with respect to the issue of liability relating to each of the claims that it had asserted against both defendants aside from its claim for punitive damages. On the same date,

Mr. Osae filed a motion seeking summary judgment in its favor with respect to SciGrip's claims for misappropriation of trade secrets claim, unfair and deceptive trade practices, and punitive damages, and Scott Bader filed a motion seeking summary judgment in its favor with respect to each of the claims that SciGrip had asserted against it in the amended complaint. In addition, Mr. Osae filed a motion seeking to have the testimony of two of SciGrip's experts, Michael Paschall and Edward Petrie, excluded from the evidentiary record. A hearing was held before the trial court for the purpose of considering the parties' motions on 28 September 2017.

On 16 January 2018, the trial court entered a sealed order deciding the issues raised by the parties' motions.[2] With respect to SciGrip's misappropriation of trade secrets claim, the trial court noted that this Court had not yet decided which choice of law test should be applied in connection with misappropriation of trade secret claim: (1) the *lex loci delicti* test (*lex loci* test), which requires the use of the law of the state "where the injury or harm was sustained or suffered," *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 695, 698 S.E.2d 719, 724 (2010) (quoting 16 Am. Jur. 2d *Conflict of Laws* § 109 (2009)), or (2) the "most significant relationship test," a multi-factor test which requires the use of the law of the state with the most significant ties to the parties and the facts at issue in the case in question. Acting in reliance upon the Business Court's earlier decision in *Window World of Baton Rouge,*

---

[2] A redacted version of the same order was filed on 30 January 2018.

*LLC v. Window World, Inc.*, 2017 NCBC 58, 2017 WL 2979142, the trial court elected to apply the *lex loci* test in identifying the law applicable to SciGrip's misappropriation of trade secrets claim in this case and focused its analysis upon the place at which "the tortious act of misappropriation and use of the trade secret occurred," quoting *Domtar AI Inc. v. J.D. Irving, Ltd.*, 43 F. Supp. 3d 635, 641 (E.D.N.C. 2014). In view of the fact that SciGrip did not argue that Mr. Osae had wrongfully acquired the disputed information in North Carolina, the fact that the patent application in which SciGrip's proprietary information had allegedly been disclosed by Scott Bader had been filed in Europe, and the fact that Mr. Osae's laboratory work for Scott Bader had been performed in England or Ohio rather than North Carolina, the trial court concluded that SciGrip had failed to demonstrate that Mr. Osae and Scott Bader had misappropriated SciGrip's trade secrets in North Carolina and that summary judgment should be entered in favor of Mr. Osae and Scott Bader with respect to this claim. Similarly, the trial court noted that any purported evidence of misappropriation that might have occurred during Mr. Osae's employment with Engineered Bonding involved actions that occurred outside of North Carolina. As a result, the trial court entered summary judgment in favor of both defendants with respect to SciGrip's misappropriation of trade secrets claim.

In addressing SciGrip's breach of contract claims, the trial court noted that the parties agreed that the claims in question were governed by North Carolina law. According to the trial court, the relevant provisions of the consent order protected

legitimate business interests and were, for that reason, valid and enforceable. Similarly, the trial court held that, since the consent order prohibited any use of SciGrip's confidential information in any manner, SciGrip was not required to show that an intentional breach of contract had occurred. In addition, the trial court determined that the record reflected the existence of genuine issues of material fact concerning the date upon which SciGrip had learned that Mr. Osae and Scott Bader had breached their obligations under the consent order, with this dispute being sufficient to preclude an award of summary judgment in favor of SciGrip and against Scott Bader on statute of limitations grounds. Finally, the trial court concluded that, since the record contained undisputed evidence tending to show that certain components used in Crestabond products were unknown to the general public prior to the publication of the European patent application, SciGrip was entitled to the entry of summary judgment in its favor against Mr. Osae for breaching the provisions of the consent order in connection with the development of Crestabond products.

Similarly, in addressing SciGrip's breach of contract claim against Mr. Osae relating to events that occurred after he left Scott Bader to join Engineered Bonding, the trial court concluded that certain components upon which SciGrip's claim was based were either publicly known prior to the filing of Scott Bader's European patent application or had not been used in Engineered Bondings' Acralock product, but that the record did not permit a conclusive determination as to the extent to which another component upon which SciGrip's claim was based was equivalent to a component

used in the Acralock product. As a result, the trial court refused to grant summary judgment in favor of either party with respect to the breach of contract claim that SciGrip asserted against Mr. Osae based upon his alleged conduct following his departure from Scott Bader for Engineered Bonding.

Moreover, given that it had already granted summary judgment in Mr. Osae and Scott Bader's favor with respect to SciGrip's trade secrets claim, given that SciGrip's unfair and deceptive trade practices claim rested upon its misappropriation of trade secrets claim, and given that SciGrip had failed to assert that the breach of contract in which Scott Bader and Mr. Osae had allegedly engaged involved any substantial aggravating circumstances, the trial court granted summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's unfair and deceptive trade practices claim.

In addition, given that SciGrip's only surviving claims sounded in breach of contract; that punitive damages may not be awarded for breach of contract in the absence of an identifiable tort, citing *Cash v. State Farm Mut. Auto Ins. Co.*, 137 N.C. App. 192, 200, 528 S.E.2d 372, 377 (2000) (stating that, "in order to sustain a claim for punitive damages, there must be an identifiable tort which is accompanied by or partakes of some element of aggravation"); and that SciGrip had failed to forecast any evidence tending to show the occurrence of such a tort, the trial court concluded that SciGrip's punitive damages claim did not retain any viability. As a result, the trial

court entered summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's request for punitive damages.

Finally, the trial court determined that the expert testimony proffered by Mr. Paschall and Mr. Petrie on behalf of SciGrip only related to SciGrip's misappropriation of trade secrets and unfair and deceptive trade practices claims and had no bearing upon its surviving breach of contract claims. In view of the fact that SciGrip's misappropriation of trade secrets and unfair and deceptive trade practices claims had been dismissed for other reasons, the trial court determined that Mr. Osae's motions to exclude the testimony of Mr. Paschall and Mr. Petrie on behalf of SciGrip had been rendered moot. SciGrip and Mr. Osae noted appeals to this Court from the trial court's order. In addition, SciGrip filed a conditional petition seeking the issuance of a writ of certiorari on 3 July 2018 in which it requested that this Court "treat and accept its appeal of the Order and Opinion on Motion for Summary Judgment [and] Motions to Exclude . . . entered in the above-captioned case" in the event that this Court concluded that no substantial rights of SciGrip were affected by the trial court's decision. On 26 October 2018, this Court allowed SciGrip's conditional petition for writ of certiorari.

## II. Substantive Legal Analysis

### A. Standard of Review

According to well-established North Carolina law, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). An appellate court reviews a trial court's decision\* to grant or deny a motion for summary judgment *de novo*. *See Meinck v. City of Gastonia*, 371 N.C. 497, 502, 819 S.E.2d 353, 357 (2018). A trial court's ruling concerning the admissibility of expert's testimony "will not be reversed on appeal absent a showing of abuse of discretion." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004), *superseded by statute*, N.C.G.S. § 8C-1, Rule 702, 2011 N.C. Sess. Laws 283). "A trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *State v. Lane*, 365 N.C 7, 27, 707 S.E.2d 210, 223 (2011).

## B. SciGrip's Claims

In seeking relief from the challenged trial court orders, SciGrip contends that the trial court erred by: (1) applying the *lex loci* test rather than the most significant relationship test in evaluating the merits of its misappropriation of trade secrets claim; (2) granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its misappropriation of trade secrets claim based upon a misapplication of the *lex loci* test; (3) granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its unfair and deceptive trade practices claim given the existence of evidence tending to show the existence of the necessary aggravating circumstances;

(4) granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its punitive damages claim given that the record contained sufficient evidence to show that those two parties engaged in sufficiently aggravated or malicious behavior; (5) concluding that one of the components upon which its breach of contract claims rested had been made public prior to the publication of Scott Bader's European patent application; (6) denying as moot Mr. Osae's motions to exclude the testimony of Mr. Paschall and Mr. Petrie given that their testimony was relevant to other claims; and (7) denying SciGrip's motion for summary judgment with respect to its breach of contract claim against Mr. Osae arising from his work for Engineered Bonding on the grounds that one of the components upon which SciGrip's claim relied had not been shown to be equivalent to one of the components used in SciGrip's proprietary products. We will examine the validity of each of SciGrip's challenges to the trial court's order in the order in which SciGrip has presented them before the Court.

### 1. Misappropriation of Trade Secrets

### a. Choice of Law

As an initial matter, SciGrip argues that the trial court erred by entering summary judgment in favor of Scott Bader and Mr. Osae with respect to its misappropriation of trade secrets claim on the grounds that the trial court should have utilized the most significant relationship test, rather than the *lex loci* test, in

making this determination.[3]  In support of this contention, SciGrip directs our attention to numerous decisions of the Court of Appeals and from courts in other jurisdictions which utilize the most significant relationship test rather than the *lex loci* test in deciding multistate commercial cases.  According to SciGrip, these decisions tend to prefer the use of the most significant relationship test on the grounds that it avoids rigidity and makes it possible to use "a more flexible approach which would allow the court in each case to inquire which state has the most significant relationship with the events constituting the alleged tort and with the parties." *Santana, Inc. v. Levi Strauss and Co.*, 674 F.2d 269, 272 (4th Cir. 1982).  In addition, SciGrip asserts that the trial court's reliance upon *Window World* was misplaced given that it relied upon a decision of this Court in a products liability case rather than a case in which the court was called upon to decide issues arising from commercial relations involving entities located in and events occurring in multiple jurisdictions.

Mr. Osae responds that, under the conflict of laws principles traditionally utilized in this jurisdiction, the *lex loci* test has been deemed applicable in dealing with claims that affect the substantial rights of the parties, citing *Harco Nat'l Ins.*

---

[3] The trial court deemed the choice of law issue in this case dispositive on the grounds that, since "the undisputed evidence demonstrates that the alleged misappropriation occurred outside the State of North Carolina," "[SciGrip] cannot bring a claim under the North Carolina [Trade Secrets Protection Act]."  In view of the fact that none of the parties have challenged the validity of this portion of the trial court's analysis on appeal, we assume, without deciding, that it is correct.

*Co.*, 206 N.C. App. at 692, 698 S.E.2d at 722. In addition, Mr. Osae asserts that the federal courts sitting in this and other states have tended to apply the *lex loci* test in determining whether particular misappropriation of trade secrets claims are encompassed within the ambit of the North Carolina Trade Secrets Protection Act, citing *Domtar Al Inc.*, 43 F. Supp. 3d at 641, *Chattery Int'l Inc. v. JoLida, Inc.*, No. WDQ-10-2236, 2012 U.S. Dist. WL 1454158 (D. Md. Apr. 2 2012), and *3A Composites USA, Inc. v. United Indus., Inc.*, No. 5:14-CV-5147, 2015 U.S. Dist. WL 5437119 (W.D. Ark. Sept. 15 2015). Mr. Osae argues that, when taken in their entirety, these cases demonstrate that, under North Carolina law, the ultimate issue for choice of law purposes is the location at which the act of misappropriation occurred rather than the location at which the defendant obtained the information that he or she misappropriated. In the same vein, Scott Bader emphasizes that misappropriation of trade secrets claims sound in tort and that North Carolina precedent unequivocally calls for the use of the *lex loci* test to decide conflict of laws issues arising in tort cases.

According to the *lex loci* test, the substantive law of the state "where the injury or harm was sustained or suffered," which is, ordinarily, "the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place," applies. *Harco Nat'l Ins. Co.*, 206 N.C. App. at 695, 698 S.E.2d at 724 (quoting 16 Am. Jur. 2d *Conflict of Laws* § 109 (2009)). The most significant relationship test, on the other hand, provides for the use of the substantive law of the state with the most significant relationship to the claim in question, with that

determination to be made on the basis of an evaluation of "(a) the place where the injury occurred; (b) the place where the conduct giving rise to the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; [and] (d) the place where the relationship, if any, between the parties is centered." *Henry v. Henry*, 291 N.C. 156, 163–64, 229 S.E.2d 158, 163 (1979) (quoting Restatement, Conflict of Laws 2d, § 145). We agree with the trial court that the proper choice of law rule for use in connection with our evaluation of SciGrip's misappropriation of trade secrets claim is the *lex loci* test.

As the trial court noted, this Court's jurisprudence favors the use of the *lex loci* test in cases involving tort or tort-like claims. *See, e.g., Boudreau v. Baughman*, 322 N.C. 331, 335–36, 368 S.E.2d 849, 853–54 (1988) (noting that "[o]ur traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by *lex loci*," with this Court having "consistent[ly] adhere[d]" to the *lex loci* test in tort actions" and with there being "no reason to abandon this well-settled rule at this time"); *Braxton v. Anco Electric, Inc.*, 330 N.C. 124, 126–27, 409 S.E.2d 914, 915 (1991) (stating that "[w]e do not hesitate in holding that as to the tort law controlling the rights of the litigants in the lawsuit . . . the long-established doctrine of *lex loci delicti commissi* applies"); s*ee also GYBE v. GYBE*, 130 N.C. App. 585, 587–88, 503 S.E.2d 434, 435 (1998) (noting that a "review of North Carolina caselaw reveals a steadfast adherence by our courts to the traditional application of the *lex loci delicti* doctrine" in matters affecting the substantive rights of the parties).

Consistent with our traditional approach, a number of federal district courts have applied the *lex loci* test when assessing North Carolina trade secrets misappropriation claims. For example, a federal district court held in *Domtar AI Inc.* that "North Carolina's choice of law rules call for the application of the *lex loci delicti* (or 'law of the place of the wrong') test to determine which law should apply to claims for misappropriation of trade secrets," with "the *lex loci* [in trade secrets cases being] where the actual misappropriation and use of the trade secret occurs" rather than the place at which the defendant obtained the relevant information. *Domtar AI Inc.*, 43 F. Supp. 3d at 641 (citing *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1456 n.3 (M.D.N.C. 1996), and *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 735 F. Supp. 1555, 1568 (M.D. Ga. 1989), *aff'd as modified*, 908 F.2d 706 (11th Cir. 1990)). Similarly, in *3A Composites USA*, 2015 U.S. Dist. WL 5437119 at *1, a federal district court concluded that a North Carolina court "would have applied the *lex loci delicti* rule to determine which state's laws govern all of [the North Carolina employer's] claims other than breach of contract," including the plaintiff's misappropriation of trade secrets claim, *id*. at *3–4 (citing *United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 129 (W.D.N.C. 1991) (predicting that this Court "would apply the traditional *lex loci* rule rather than the most significant relationship test" in a deceptive trade practices case); *Martinez v. Nat'l Union Fire Ins. Co.*, 911 F. Supp. 2d 331, 338 (E.D.N.C. 2012) (noting that this Court "has affirmed the continuing validity" of the *lex loci* test in deceptive trade practices cases); and *Domtar AI Inc.*, 43

F. Supp. 3d at 641 (applying *lex loci* test to a misappropriation of trade secrets claim)). As a result, the weight of this Court's decisions and those of federal courts predicting how this Court would address misappropriation of trade secrets claims tends to support the application of the *lex loci* test, rather than the most significant relationship test, in the misappropriation of trade secrets context.

The result suggested by the weight of authority is supported by more practical considerations. In rejecting the Second Restatement approach to conflict of laws issues, of which the most significant relationship test is an example, in *Boudreau*, we stated that the *lex loci* test "is an objective and convenient approach which continues to afford certainty, uniformity, and predictability of outcome in choice of law decisions." *Boudreau*, 322 N.C. at 336, 368 S.E.2d at 854. Although we cannot disagree with SciGrip's contention that use of the most significant relationship test would provide North Carolina courts with greater flexibility in identifying the state whose law should apply in any particular instance, that increased flexibility is achieved at the cost of introducing significant uncertainties into the process of identifying the state whose law should apply, which we do not believe would be beneficial. Moreover, while the application of the *lex loci* test can be difficult in some circumstances, including cases involving events that occur in and entities associated with multiple jurisdictions, those difficulties pale in comparison with the lack of certainty inherent in the application of a totality of the circumstances test such as the most significant relationship test. As a result, we hold that the trial court did not

err by determining that the appropriate choice of law test for use in misappropriation of trade secrets cases is the *lex loci* test.

## b. Application of the *Lex Loci* Test

Secondly, SciGrip argues that, even if the *lex loci* test, rather than the most significant relationship test, should be utilized in identifying the state whose law should be deemed controlling in this case, a proper application of the *lex loci* test compels the conclusion that North Carolina is the state in which the last act necessary to establish its claim occurred. According to SciGrip, the last act giving rise to its misappropriation of trade secrets claim was not the development work that Mr. Osae performed for Scott Bader in the United Kingdom and Ohio or the filing of Scott Bader's European patent application. Instead, SciGrip argues that the last act in this case was, for *lex loci* purposes, the "acquisition, disclosure or use" of another's trade secret without the owner's consent, citing N.C.G.S. § 66-152(1), which SciGrip contends occurred when Scott Bader and Mr. Osae violated the consent order, which had been entered by a North Carolina court.[4] In addition, SciGrip argues that, unlike the situation that existed in cases such as *Domtar AI Inc.*, *3A Composites*, and *Chattery*, in which the defendant-employees had each relocated to another state in order to work for a competitor, Mr. Osae remained a resident of North Carolina

---

[4] SciGrip does not appear to contend that Mr. Osae performed any act of misappropriation in North Carolina during the time that he was employed by Engineered Bonding and has not, for that apparent reason, argued that, under the *lex loci* test, there is any basis for finding that North Carolina law applies to that portion of its claim against Mr. Osae.

throughout the period during which the misappropriation of SciGrip's trade secrets allegedly occurred. SciGrip further argues that, since its principal place of business is located in North Carolina, the ultimate injury caused by the alleged misconduct of Scott Bader and Mr. Osae occurred in this jurisdiction, citing *Verona v. U.S. Bancorp*, No. 7:09-CV-057-BR, 2011 WL 1252935 (E.D.N.C. Mar. 29, 2011) (holding that the place of the injury in a defamation case was the state in which the defamatory statement was published); and *Harco*, 206 N.C. App. at 697, 698 S.E.2d at 725–26 (stating that the location of the plaintiff's place of business "may be useful for determining the place of plaintiff's injury in those rare cases where, even after a rigorous analysis, the place of injury is difficult or impossible to discern"). In SciGrip's view, a decision to apply the law of another jurisdiction would frustrate the purpose of the North Carolina Trade Secrets Protection Act, which it asserts is intended to protect the trade, commerce, and residents of North Carolina. Finally, SciGrip asserts that, even if North Carolina law does not apply in this instance, the trial court should have applied the law of the applicable state rather than simply dismissing its claim, citing *Charnock v. Taylor*, 223 N.C. 360, 362, 26 S.E.2d 911, 913 (1943) (stating that, "[i]f under the *lex loci* [test] there [is] a right of action, comity permits it to be prosecuted in another jurisdiction").

Mr. Osae, on the other hand, argues that, while North Carolina law governs SciGrip's breach of contract claim, the mere fact that North Carolina law applies to that claim does not render North Carolina law applicable to any other claim, citing

*Domtar AI Inc.*, 43 F. Supp. 3d at 641–42. In addition, Mr. Osae argues that the plaintiff's principal place of business is not determinative for choice of law purposes under the *lex loci* test, with the identification of the relevant state instead being dependent upon the place at which the use and disclosure of the misappropriation of the proprietary information occurred instead, citing *id.*; *Harco Nat'l Ins. Co.*, 206 N.C. App. at 697, 698 S.E.2d at 725–26 (declining to create a bright line rule for purposes of the *lex loci* test that a plaintiff's injury is suffered at its principal place of business); and *United Dominion Indus.*, 762 F. Supp. at 129–31 (rejecting an argument advanced in the context of an unfair and deceptive practices case that, for purposes of the *lex loci* test, the location of the corporation's "pocketbook" should determine the location at which the offending conduct occurred), and with any unlawful use or disclosure of SciGrip's information having occurred in the United Kingdom, Ohio, or Florida rather than in North Carolina. Mr. Osae criticizes SciGrip's reliance upon decisions in defamation cases, which he contends are not analogous to cases involving misappropriation of trade secrets claims. Finally, Mr. Osae responds to SciGrip's public policy discussion by arguing that the trial court acted reasonably by declining to extend the scope of the North Carolina Trade Secrets Protection Act to the United Kingdom, Ohio, and Florida.

In addition to echoing a number of the arguments advanced by Mr. Osae, Scott Bader asserts that the fact that Mr. Osae continued to own property and reside in North Carolina during his period of employment with Scott Bader and Engineered

Bonding did not tend to show that he had impermissibly used or disclosed SciGrip's confidential information in North Carolina. Instead, Scott Bader argues that the only work that Mr. Osae did for Scott Bader in North Carolina involved sales rather than product formulation. In Scott Bader's view, SciGrip's contention that Mr. Osae possessed and used his company-issued laptop computer and laboratory books to formulate adhesives in North Carolina lacks any support in the record evidence. Scott Bader contends that any breach of the consent order that either Scott Bader or Mr. Osae may have committed did not convert SciGrip's breach of contract claim into a misappropriation of trade secrets claim. Finally, Scott Bader argues that SciGrip's failure to request the trial court to consider a misappropriation of trade secrets claim on any theory other than as a violation of the North Carolina Trade Secrets Protection Act precludes it from asserting such a claim under the law of any other jurisdiction, citing *Leonard v. Johns-Manville Sales Corp.*, 309 N.C. 91, 95, 305 S.E.2d 528, 531 (1983) (stating that "[t]he party seeking to have the law of a foreign jurisdiction apply has the burden of bringing such law to the attention of the court").

Having determined that the *lex loci* test, rather than the most significant relationship test, should be utilized to determine whether North Carolina law applies to SciGrip's misappropriation of trade secrets claim, we have no hesitation in concluding that North Carolina law does not apply to this claim. Our conclusion to this effect rests upon the fact that all of the evidence tends to show that any misappropriation of SciGrip's trade secrets in which Mr. Osae and Scott Bader may

have engaged occurred outside North Carolina and the fact that such a determination is consistent with the applicable decisions of courts applying North Carolina law. *See Domtar AI Inc.*, 43 F. Supp. 3d at 641; *Harco Nat'l Ins. Co.*, 206 N.C. App. at 692, 698 S.E.2d at 722. As a result, the North Carolina Trade Secrets Protection Act does not provide a source of liability given the facts of this case.

SciGrip's arguments fail to persuade us to reach a different conclusion. First, SciGrip urges us to conclude that the fact that Mr. Osae continued to reside in North Carolina and that he might have brought his laptop computer and laboratory notebook to North Carolina on his trips home suggests that he impermissibly used SciGrip's proprietary information in North Carolina while working for Scott Bader. However, the factual basis upon which this aspect of SciGrip's argument rests is simply insufficient to permit an inference that any misappropriation of SciGrip's trade secrets occurred in North Carolina. Secondly, the fact that Scott Bader's European patent application was published worldwide, including in North Carolina, does not suffice to render North Carolina law applicable to this law. On the contrary, acceptance of this logic would make the law of every jurisdiction in the United States or, perhaps, the entire world applicable to SciGrip's misappropriation of trade secrets claim. Similarly, the fact that the record contains sufficient evidence to permit a determination that Scott Bader and Mr. Osae violated a North Carolina consent order does not somehow render the North Carolina Trade Secrets Protection Act applicable to its misappropriation of trade secrets claim given that different choice of law rules

govern tort or tort-like actions and breach of contract claims. As a result, the trial court did not err by determining that North Carolina law did not apply to SciGrip's misappropriation of trade secrets claim.[5]

Although SciGrip argues, in the alternative, that the trial court should have applied the law of the jurisdiction in which the last act necessary to support its misappropriation of trade secrets claim occurred rather than granting summary judgment in favor of Scott Bader and Mr. Osae with respect to that claim, that argument is equally unavailing. At the time that SciGrip filed its amended complaint in this case, it had ample knowledge of the basic facts underlying its misappropriation of trade secrets claim. Instead of seeking relief under the law of another relevant jurisdiction, SciGrip asserted a claim under the North Carolina Trade Secrets Protection Act. Having pled and argued its claim in this manner before the trial court, SciGrip is not entitled to seek relief from the trial court's summary judgment order on the grounds that the trial court should have evaluated the validity of

---

[5] In addition to the arguments discussed in the text, Scott Bader has also argued that SciGrip waived any claim for misappropriation of trade secrets that it might have otherwise had when it disclosed its allegedly proprietary information in public filings and in open court during the litigation of this case, citing *Krawiec v. Manly*, 370 N.C. 602, 611, 811 S.E.2d 542, 549 (2018) and *Glaxo, Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1301–02 (E.D.N.C. 1996), *aff'd*, 110 F.3d 1562 (Fed. Cir. 1997); that SciGrip's misappropriation of trade secrets claim was barred by the statute of limitations and rested upon inadmissible hearsay; and that SciGrip's misappropriation of trade secrets claim was barred by the economic loss rule. In view of our decision to affirm the trial court's decision to grant summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's misappropriation of trade secrets claim on the grounds discussed in the text of this opinion, we need not address these additional arguments any further in this opinion.

SciGrip's misappropriation of trade secrets claim on the basis of a different legal theory. As a result, for all of these reasons, the trial court did not err by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's misappropriation of trade secrets claim.

## 2. Unfair and Deceptive Trade Practices Claim

SciGrip contends that the trial court erred by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its unfair and deceptive trade practices claim on the grounds that SciGrip had, in fact, forecast evidence tending to show the existence of the aggravating circumstances needed to support that claim.[6] We do not find this argument persuasive.

"In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citing *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). As a general proposition, unfairness or "deception either in the formation of the contract or in the circumstances of its breach" may establish the existence of

---

[6] In addition, SciGrip argued that its unfair and deceptive trade practices claim rested upon its misappropriation of trade secrets claim and that the trial court had erred by dismissing that claim. Having held that the trial court properly dismissed SciGrip's misappropriation of trade secrets claim, we need not address this aspect of SciGrip's challenge to the dismissal of its unfair and deceptive trade practices claim any further in this opinion.

substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim. *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) (citing *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981)). Moreover, in some circumstances, a continuous transaction may constitute an unfair or deceptive act in addition to a breach of contract. *See Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 116 (1993). In the event that the same act or transaction supports a claim for both breach of contract and unfair or deceptive trade practices, "damages may be recovered either for the breach of contract, or for violation of [N.C.G.S. § 75-1.1]." *Id.* (quoting *Marshall v. Miller*, 47 N.C. App. 530, 542, 268 S.E.2d 97, 103 (1980), *modified and aff'd*, 302 N.C. 539, 276 S.E.2d 397 (1981)).

According to SciGrip, the breaches of contract committed by Scott Bader and Mr. Osae constituted such "immoral, unethical, oppressive, unscrupulous, or substantially injurious" conduct as to establish the substantial aggravating circumstances needed to support the maintenance of an unfair and deceptive trade practices claim in the present context, particularly given that the conduct in question resulted in significant damage to SciGrip and reflected a complete failure on the part of Scott Bader and Mr. Osae to comply with the consent order, quoting *Process Components, Inc v. Baltimore Aircoil Co.*, 89 N.C. App. 649, 654, 366 S.E.2d 907, 911, *aff'd per curiam*, 323 N.C. 620, 374 S.E.2d 116 (1988). On the other hand, Mr. Osae and Scott Bader assert that SciGrip failed to argue that their alleged breaches of

contract constituted substantial aggravating circumstances before the trial court and that, even if such an argument had been advanced, the trial court properly found that SciGrip's breach of contract claim, standing alone, did not suffice to support the maintenance of an unfair and deceptive trade practices claim, citing *Mitchell v. Linville*, 148 N.C. App. 71, 74–75, 557 S.E.2d 620, 623 (2001) (holding that an intentional breach of contract claim cannot, in and of itself, provide the basis for an unfair and deceptive trade practices claim), and *Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 217, 646 S.E.2d 550, 558 (2007) (holding that a plaintiff had to show both a breach of contract and the presence of substantial aggravating circumstance in order to support its unfair and deceptive trade practices claim). In addition, Mr. Osae argues that, even if SciGrip had forecast sufficient evidence to show the existence of the necessary substantial aggravating circumstances, it failed to prove that it had sustained an actual injury proximately caused by the conduct of Scott Bader and Mr. Osae.

Assuming, without in any way deciding, that SciGrip has properly preserved its "substantial aggravating circumstances" argument for purposes of appellate review, we are not persuaded that the record contains sufficient evidence to show that the necessary substantial aggravating circumstances existed. In essence, the evidence that SciGrip relies upon in support of its argument for the existence of the necessary substantial aggravating circumstances amounts to nothing more than an assertion that Mr. Osae and Scott Bader intentionally breached the consent order

while knowing of its existence. As the Court of Appeals correctly held in *Mitchell*, such an intentional breach of contract, standing alone, simply does not suffice to support the assertion of an unfair and deceptive trade practices claim. As a result, we conclude that the trial court did not err by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's unfair and deceptive trade practices claim.

### 3. Punitive Damages

SciGrip contends that the trial court erred by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its punitive damages claim. Once again, we are not persuaded by SciGrip's argument.[7]

In seeking to persuade us of the merits of its challenge to the trial court's decision with respect to this issue, SciGrip argues that the conduct of both Scott Bader and Mr. Osae at the time that they breached their obligations under the consent order was sufficiently egregious to merit an award of punitive damages, citing *Cash*, 137 N.C. App. at 200–01, 528 S.E.2d 377), and *Oakeson v. TBM Consulting Crp., Inc.*, 2009 NCBC 23, ¶52, 2009 WL 464558, *9 (stating that, "when a breach of contract claim reflects potential fraud or deceit, or other aggravated or malicious

---

[7] In addition to the argument discussed in the text of this opinion, SciGrip argues that the trial court erred by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to its misappropriation of trade secrets and unfair and deceptive trade practices claims, either of which would suffice to support a punitive damages award. In view of our decision to affirm the trial court's order with respect to these two claims, we need not address this aspect of SciGrip's argument any further.

behavior, a claim for punitive damages may lie"). According to SciGrip, Mr. Osae was angry at SciGrip because he believed that he had been treated unfairly and inadequately compensated for his work, with his decision to utilize SciGrip's proprietary information in violation of the consent order while in Scott Bader's employment and to attempt to conceal the nature of his activities by backdating his laboratory notebooks reflecting his high degree of personal animosity against his former employer. Moreover, SciGrip asserts that Mr. Osae acted maliciously when he provided Scott Bader with photographs of SciGrip's equipment and its customer lists and when he formed Engineered Bonding to compete with SciGrip using SciGrip's proprietary information. Similarly, SciGrip contends that Scott Bader's conduct in soliciting, accepting, using, and disclosing SciGrip's confidential information in violation of the consent order constituted aggravating conduct sufficient to support an award of punitive damages.

Mr. Osae argues that punitive damages may not be awarded for a breach of contract in the absence of a separate, identifiable tort and an allegation that the defendant engaged in aggravated or malicious behavior, citing *Cash*, 137 N.C. App. at 200, 528 S.E.2d at 277 (stating that "[p]unitive damages are not allowed [for breaches of contract] even when the breach is wil[l]ful[l], malicious or oppressive"). Similarly, Scott Bader points out that N.C.G.S. § 1D-15(d) specifically states that "[p]unitive damages shall not be awarded against a person solely for breach of contract." N.C.G.S. § 1D-15(d).

According to well-established North Carolina law, punitive damages may not be awarded based upon the breach of a contract in the absence of the commission of an identifiable tort. *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976) (stating that, even though "North Carolina follows the general rule that punitive or exemplary damages are not allowed for breach of contract, with the exception of a contract to marry," "where there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort itself may give rise to a claim for punitive damages") (citing *Oestreicher v. Stores*, 290 N.C. 118, 134–35, 225 S.E.2d 797, 808 (1976)). SciGrip has not forecast sufficient evidence to establish that Scott Bader and Mr. Osae committed a separate tort at the time that they allegedly breached their contractual obligations under the consent order. Instead, as we noted in our discussion of SciGrip's challenge to the trial court's decision to grant summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGrip's unfair and deceptive trade practices claim, the evidence upon which SciGrip relies in support of its challenge to the trial court's decision to grant summary judgment in favor of Mr. Osae and Scott Bader with respect to SciGrip's punitive damages claim consists of little more than a contention that Mr. Osae and Scott Bader intentionally breached the consent judgment. No matter how deplorable such an act may be, an intentional breach of contract does not constitute a separate tort. As a result, the trial court did not err by granting summary judgment in favor of Scott Bader and Mr. Osae with respect to SciGri's punitive damages claim.

**4. Confidentiality of Information**

SciGrip contends that the trial court erred by finding in favor of Scott Bader and Mr. Osae with respect to the issue of whether one of the components underlying SciGrip's breach of contract claim against Scott Bader and Mr. Osae arising from Mr. Osae's employment with Scott Bader was, in fact, proprietary information. Once again, we are not persuaded that SciGrip's contention has merit.

In support of this contention, SciGrip argues that the trial court's decision rested upon an erroneous determination that the fact that the relevant component was equivalent to another, publicly known component, meant that the relevant component was publicly known as well. SciGrip asserts that it is undisputed that, prior to the publication of Scott Bader's European patent application, the fact that the relevant component was equivalent to the publicly known component was not publicly known. At the very least, SciGrip contends that a genuine issue of material fact exists with respect to this issue sufficient to preclude summary judgment.

Mr. Osae, on the other hand, contends that the fact that the record contains evidence tending to show that another entity discussed the use of the relevant component as a replacement for the publicly known component provides ample support for the trial court's decision. In addition, Mr. Osae argues that SciGrip lacks the ability to demonstrate that the relevant component possesses any independent economic value given that SciGrip has not attempted to sell the product and given

that there is no other evidence tending to show that the relevant component has any independent economic value.

A careful review of the record demonstrates that the undisputed evidence establishes that the interchangeability of the two components was publicly known in that at least one other industry participant had discussed using the relevant component for the same purpose as the publicly known component. More specifically, the record contains undisputed evidence tending to show that the prior substance, which was chemically equivalent to the substance upon which SciGrip's claim rests, had been publicly disclosed in a number of prior patents. In addition, the record reflects that a sales representative for the company selling both the earlier and discontinued substance had stated that the new substance was intended to be used as a replacement for the earlier one. As a result, we agree with the trial court's conclusion that there is no genuine issue of material fact concerning the extent to which the relevant component was publicly known prior to the time at which Scott Bader and Mr. Osae used it in Scott Bader's Crestabond products.

## 5. Admissibility of Expert Testimony

Next, SciGrip contends that the trial court erred by denying Mr. Osae's motions to exclude the testimony of two of its expert witnesses on the grounds that the motion in question had been rendered moot. The trial court reached this conclusion on the grounds that the testimony offered by Mr. Petrie and Mr. Paschall was only relevant to SciGrip's misappropriation of trade secrets claim and had no bearing upon its

claims for breach of contract. We are unable to agree with SciGrip's argument concerning the expert testimony that it sought to elicit from Mr. Paschall and Mr. Petrie.

According to SciGrip, the testimony of Mr. Petrie concerning the extent to which Mr. Osae had the ability to independently develop adhesive products and whether the composition of one of the components used in Engineered Bonding's United States patent application was readily ascertainable through reverse engineering was relevant to SciGrip's claim against Mr. Osae for breaching the consent order during his employment with Engineered Bonding. Mr. Osae, on the other hand, argues that Mr. Petrie's testimony did not express any opinion concerning the extent, if any, to which Mr. Osae violated the consent order during his period of employment with Engineered Bonding.

Similarly, SciGrip argues that the testimony of Mr. Paschall, which addressed the amount of damages that SciGrip sustained as the result of the misappropriation of its trade secrets, was also relevant to SciGrip's claim for breach of contract relating to the period of time during which Mr. Osae worked for Engineered Bonding. More specifically, SciGrip argues that it has been unable to ascertain the full extent of the loss that it sustained as a result of Mr. Osae's breach of the consent order during his association with Engineered Bonding and that Mr. Paschall's testimony contains information directly relevant to this issue, citing *Potter v. Hileman Labs., Inc.*, 150 N.C. App. 326, 336, 564 S.E.2d 259, 266 (2002) (holding that, in a case in which one

party allegedly profited from the violation of a consent order relating to the use of the other party's confidential information, a trial court could appropriately consider the profits earned by the breaching party in determining the amount of damages that the plaintiff was entitled to recover). In response, Mr. Osae asserts that any opinion that Mr. Paschall might express concerning the amount by which Engineered Bonding has been unjustly enriched as the result of Mr. Osae's breach of the consent order during the time that he was employed by Engineered Bonding has no bearing upon the amount of damages that SciGrip would be entitled to recover as the result of any breach of contract that occurred during that time, particularly given that Engineered Bonding is not a party to this case and that Mr. Paschall did not render an opinion concerning the extent to which Mr. Osae might have been personally enriched.

Although the parties have discussed this issue as if it involved issues relating to the admissibility of expert testimony, their arguments focus upon the relevance of the challenged evidence rather than upon whether the challenged evidence satisfied the requirements for the admission of expert testimony set out in our recent decision in *State v. McGrady*, 368 N.C. 880, 787 S.E.2d 1 (2016). As a result, the ultimate question for our consideration with respect to this issue is whether the proffered evidence had "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401.

The expert testimony of Mr. Petrie was proffered for the purpose of determining whether the allegedly proprietary information upon which SciGrip's misappropriation of trade secrets claim rested was commonly known to SciGrip's competitors prior to its disclosure, the potential value of the allegedly proprietary information, and the extent to which Scott Bader and Mr. Osae had misappropriated SciGrip's trade secrets. Although some of the information contained in Mr. Petrie's expert testimony touches upon information relevant to SciGrip's breach of contract claims, the opinions that Mr. Petrie expressed concerning whether the information in question constituted a trade secret has no bearing upon the validity of SciGrip's breach of contract claim, which is governed by the provisions of the consent judgment rather than by the statutory definition of a trade secret contained in N.C.G.S § 66-152(3). As a result, the trial court did not err by determining that Mr. Petrie's testimony related to SciGrip's misappropriation of trade secrets, rather than its breach of contract, claim.

The expert testimony of Mr. Paschall was proffered for the purpose of determining the amount of damages that SciGrip was entitled to recover as the result of the misappropriation of its trade secrets. A successful plaintiff in a misappropriation of trade secrets action pursuant to N.C.G.S. § 66-154(b)—similar to a claim sounding in quasi-contract or resting upon an implied contract, in which the plaintiff's claim "is *not* based on a promise but is imposed by law to prevent an unjust enrichment," *see Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 555–56

(1988)—is entitled to a recovery that considers the amount by which the wrongdoer has been unjustly enriched. However, since "[a]n action for unjust enrichment is quasi-contractual in nature," it "may not be brought in the face of an express contract." *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) (citing *In re Virginia Block Co.*, 16 B.R. 771, 774 (W.D. Va. 1982)). For that reason, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe*, 322 N.C. at 570, 369 S.E.2d at 156 (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 124 S.E.2d 905 (1962)). In view of the fact that the consent order constituted an express contract,[8] evidence tending to show that Engineered Bonding was unjustly enriched as the result of Mr. Osae's conduct is simply not relevant to SciGrip's breach of contract claim given that the consent order here, unlike the contract at issue in *Potter*, does not contain a provision authorizing the trial court to "determine the appropriate remedy" for any violation of its provisions. *Potter*, 150 N.C. App. at 334, 564 S.E.2d at 265. As a result, the trial court did not err by determining that Mr. Osae's motions to exclude the testimony of Mr. Petrie and Mr. Paschall should be denied on mootness grounds.

---

[8] Although Scott Bader contested the enforceability of the consent order at trial, the issue of whether the consent order constitutes a valid and enforceable contract is no longer in dispute between the parties.

### 6. Breach of Contract Claim Arising From
### Mr. Osae's Work for Engineered Bonding

Finally, SciGrip argues that the trial court erred by failing to grant summary judgment in its favor with respect to its breach of contract claim against Mr. Osae relating to the work that he performed after becoming associated with Engineered Bonding. In support of this contention, SciGrip argues that Mr. Osae violated the consent order in developing Engineered Bonding's Acralock product because he used a component that was equivalent to one in which SciGrip had proprietary rights in the course of developing that product. Mr. Osae, on the other hand, denies SciGrip's contention that the two components are equivalent, so that the use of the component incorporated in Engineered Bonding products did not constitute a misappropriation of proprietary information.

After carefully reviewing the evidence forecast by the parties, we agree with the trial court's determination that the record reflects the existence of a genuine issue of material fact concerning whether the component that Mr. Osae used in formulating Engineered Bonding's Acralock product is equivalent to the proprietary component incorporated into SciGrip's products. Among other things, the record reflects that both components are still on the market and that neither has completely replaced the other. In addition, the record contains evidence tending to show that the two components are not equivalent and that SciGrip spent considerable time and effort determining that the product that it claims to constitute protected information could

be used as a substitute for the product disclosed in Engineered Bonding's United States patent application. As a result, the trial court did not err by denying SciGrip's motion for summary judgment in its favor with respect to the claim that Mr. Osae violated the consent order while associated with Engineered Bonding.

## C. Mr. Osae's Claim

In his own challenge to the trial court's order, Mr. Osae argues that the trial court erred by allowing summary judgment in favor of SciGrip with respect to its breach of contract claim against Mr. Osae predicated upon Mr. Osae's actions during his employment with Scott Bader.[9] We did not find Mr. Osae's contention persuasive.

---

[9] Mr. Osae contends that the trial court's decision to grant summary judgment in SciGrip's favor with respect to the breach of contact claim that SciGrip asserted against him based upon the conduct in which he engaged during his employment with Scott Bader is immediately appealable because that portion of the trial court's order affects a substantial right. More specifically, Mr. Osae contends that, unless the relevant portion of the trial court's order is immediately appealable, there is a risk that there will be inconsistent verdicts concerning his liability and that of Scott Bader with respect to the same claim, citing *Hamby v. Profile Prods., L.L.C.*, 361 N.C. 630, 634, 652 S.E.2d 231, 234 (2007) (stating that "a substantial right is affected if the trial court's order granting summary judgment to some, but not all, defendants creates the possibility of separate trials involving the same issues which could lead to inconsistent verdicts"). In response, SciGrip argues that there are no overlapping factual issues between SciGrip's breach of contract claim against Mr. Osae relating to the work which he performed while employed by Scott Bader and SciGrip's breach of contract claim against Scott Bader given that the only issue that remains to be decided with respect to SciGrip's breach of contract claim against Scott Bader involves the question of whether that claim is time-barred. However, even though SciGrip has correctly described the reason for the trial court's refusal to grant summary judgment in SciGrip's favor with respect to its breach of contract claim against Scott Bader, SciGrip will have to prove its entire case against Scott Bader when this case is called for trial rather than being able to limit its proof to the issue of whether the applicable statute of limitations has expired. As a result, in light of the fact that there is at least some risk of an inconsistent verdict with respect to SciGrip's breach of contract claims against Mr. Oase and Scott Bader, we hold that Mr. Osae is entitled to seek appellate review of the relevant portion of the trial court's order despite the interlocutory character of that order.

According to Mr. Osae, the record reveals the existence of a genuine issue of material fact concerning the extent, if any, to which certain components upon which SciGrip's claim rests, and upon which the trial court's decision to grant summary judgment in favor of SciGrip with respect to this claim rested, constituted economically valuable information at the time that the alleged breach of contract occurred. More specifically, Mr. Osae contends that the record contains conflicting evidence concerning the extent to which the allegedly confidential components have commercial value as a result of their secrecy. In support of this argument, Mr. Osae asserts that SciGrip and its technical experts admitted during their depositions that the relevant components lacked any standalone commercial value; that SciGrip admitted that the value of the relevant components hinged upon their combination with other substances rather than their independent worth; and that, even when the components are combined with other ingredients to create a successful product, the value of the product hinges upon their trade names rather than the inherent value of the relevant components, considered generically.

Secondly, Mr. Osae contends that there is a genuine issue of material fact as to whether the relevant components were publicly known or were known by persons outside of SciGrip who could obtain economic value from their use prior to the performance of his own work for Scott Bader. More specifically, Mr. Osae asserts that the use of one of the relevant components had been disclosed in other patents prior to its use by Mr. Osae while working at Scott Bader; that the use of the specific

chemicals contained in the relevant components had been disclosed in their generic form in prior patents as well; that the manufacturer of each of the specific trade name chemicals used in the relevant components had disclosed their use and benefits to at least three of SciGrip's competitors; and that, according to a chemical expert proffered by Mr. Osae, the relevant components were "obvious combinations" of chemicals that any skilled chemist in the industry would have either been aware of or been able to develop.

SciGrip, on the other hand, contends that the relevant components were subject to protection under the consent order regardless of whether they were publicly known or had independent economic value. Instead, SciGrip asserts that the mere fact that Mr. Osae developed these components while employed by SciGrip and then disclosed them while working for Scott Bader constituted a violation of the terms of the consent order. In addition, SciGrip argues that the relevant components were not known outside of SciGrip prior to the time when Mr. Osae used and disclosed them in connection with the development of the Crestabond products given that a mere reference to certain components in other patent applications does not mean that SciGrip's unique combination of the relevant components was publicly known or known by persons outside of SciGrip who could otherwise obtain economic value from their use, citing, among other decisions, citing *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) (holding that a trade secret "can consist of a combination of elements which are in the public domain").

Similarly, SciGrip argues that the existence of the same raw materials in different components does not make the components chemically equivalent or indicate that the significance of one of the components is publicly known. Moreover, SciGrip contends that the fact that a manufacturer's disclosure of the potential use and benefits of the raw materials that it supplies does not render the components that SciGrip has created using those materials non-confidential. In the same vein, SciGrip argues that the "obviousness" of the chemical combinations involved in the relevant components is a patent law concept that has no basis in trade secrets law, citing *Basic Am., Inc. v. Shatila*, 992 P.2d 175, 183 (Idaho 1993) (holding that "obviousness" is a patent law concept not relevant to the Idaho Trade Secrets Act). Finally, SciGrip contends that the components at issue in this case derived both actual and potential independent economic value from not being known prior to their disclosure in Scott Bader's European patent application given that one of the relevant components has a unique structure and the other is superior to comparable products on the market.

A careful review of the record shows that the undisputed evidence tends to demonstrate that the relevant components have both potential and actual economic value by virtue of the fact that the resulting products have superior properties and performance compared to the comparable products available in the market, with this superiority being demonstrated by the fact that SciGrip won two new customers as a result of the development of the products in question and the fact that Scott Bader

was interested in using those components in its own products. In addition, we agree with SciGrip that the proper inquiry for purposes of determining whether the relevant components are entitled to protected status is whether those components, considered in their totality rather than on the basis of a separate evaluation of each of the individual raw materials from which they are made, constitute confidential information. When viewed in that light, the blended materials upon which SciGrip's claim rests clearly constitute proprietary information as that term is used in the consent judgment. Thus, we hold that the trial court properly determined that, at the time that Mr. Osae disclosed the relevant components in the European patent application, he breached the consent order. As a result, the trial court did not err by entering summary judgment in SciGrip's favor with respect to its claim that Mr. Osae breached the consent order during the time that he was employed by Scott Bader.

### III. Conclusion

Thus, for all of these reasons, we conclude that the trial court did not err by granting summary judgement in favor of Scott Bader and Mr. Osae with respect to SciGrip's claims for misappropriation of trade secrets, unfair and deceptive trade practices, and punitive damages; entering summary judgment in SciGrip's favor with respect to its claim for breach of contract against Mr. Osae for violating the consent judgment during his period of employment with Scott Bader; refusing to grant summary judgment in favor of SciGrip or Mr. Osae with respect to SciGrip's claim for breach of contract against Mr. Osae for violating the consent judgment during his

period of employment with Engineered Bonding; and denying Mr. Osae's motion to preclude the admission of certain expert testimony proffered on behalf of SciGrip on mootness grounds. As a result, the challenged trial court order is affirmed.

AFFIRMED.